## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | | |
|---|---|---|
| **CARLOS D. ROBLES,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **EP-14-CV-00321-FM** |
| | § | |
| **TEXAS TECH UNIVERSITY HEALTH** | § | |
| **SCIENCES CENTER a/k/a TEXAS TECH** | § | |
| **UNIVERSITY HEALTH SCIENCES** | § | |
| **CENTER AT EL PASO; BRADLEY P.** | § | |
| **FUHRMAN, M.D., in his official capacity;** | § | |
| **and RICHARD LANGE, M.D., in his** | § | |
| **official capacity,** | § | |
| | § | |
| **Defendants.** | § | |

### OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

On this day, the court considered "Defendants' Motion for Summary Judgment" ("Motion") [ECF No. 48], filed July 15, 2015 by Defendants Texas Tech University Health Sciences Center a/k/a Texas Tech University Health Sciences Center at El Paso (the "Center"); Bradley P. Fuhrman, M.D., in his official capacity ("Dr. Fuhrman"); and Richard Lange, M.D., in his official capacity ("Dr. Lange" and collectively, "Defendants"); Plaintiff Carlos D. Robles's ("Plaintiff") "Plaintiff's Opposition to Defendants' Second Motion for Summary Judgment" ("Response") [ECF No. 54], filed August 3, 2015; and "Defendants' Reply in Support of [Their] Motion for Summary Judgment" ("Reply") [ECF No. 56], filed August 13, 2015.

After considering the Motion, Response, Reply, and applicable law, Defendants' Motion is **GRANTED**.

I.      **BACKGROUND**

     *A.      Factual Background*

In 1993 or 1994, Plaintiff was diagnosed with Human Immunodeficiency Virus ("HIV").[1]

Beginning shortly after his diagnosis and continuing to approximately January 2015, Plaintiff took Atripla

to treat his HIV.[2]  Atripla caused Plaintiff to experience a variety of side effects, including mood swings.[3]

     Plaintiff was hired by the Center in or around 1996 as a patient specialist and coder within the

hospital's OB-GYN department.[4]  When he was hired, Plaintiff informed his supervisors he was HIV

positive.[5]  Furthermore, Plaintiff informed at least one supervisor of his Atripla medication, as well as its

side effects, early in his employment.[6]  In or around 2000, Plaintiff was promoted and received a position

in the hospital's pediatrics unit.[7]  Plaintiff's new position originally had the title "patient accounts

representative" but was subsequently renamed "patient services specialist" ("PSS").[8]  Among the

responsibilities of Plaintiff's position were "assuring smooth operation of the clinic patient flow and

serv[ing] as the primary contact[] for patients."[9]  In addition, the position made Plaintiff "[r]esponsible for

scheduling appointments, preparing necessary paperwork before the patient visits, receiving patients, and

---

[1] Defs.' Mot., Ex. E, "Excerpts from Robles' Deposition" ("Plaintiff's Deposition"), at 18:20–19:1, ECF No. 48-11.  Both sides' filings include different sets of pages from Plaintiff's deposition transcript.

[2] *Id.* at 22:12–23:18.

[3] Pl.'s Resp., Ex. A-1, Pl.'s Dep. 24:16–20, ECF No. 54-1.

[4] Defs.' Mot., Ex. E, Pl.'s Dep. 54:3–55:5.

[5] *Id.* at 52:22–53:11.

[6] Pl.'s Resp., Ex. A-2, Pl.'s Dep. 111:12–112:10, ECF No. 54-2.

[7] Defs.' Mot., Ex. E, Pl.'s Dep. 56:14–23, 58:17–18.

[8] *Id.* at 56:8–11; Defs.' Mot., Ex. A-1, "PSS Position Description," at 1, ECF No. 48-3.

[9] *Id.*

maintaining records," as well as "responding to requests for information from patients."[10]  Plaintiff's work as a PSS required him to have the "[a]bility to communicate effectively internally and externally" and have "a high degree of contact with patients [and Center] staff."[11]

During the course of Plaintiff's employment as a PSS, he requested multiple leaves of absence pursuant to the Family and Medical Leave Act ("FMLA"), and several of these requests were granted.[12]  However, there is no evidence that any of these requests were associated with Plaintiff's HIV diagnosis.[13]

For most of Plaintiff's service as a PSS with the pediatrics unit, he was employed at the Center's Blue Pod.[14]  The Blue Pod is the Center's walk-in clinic, where patients and their parents would meet doctors without an appointment.[15]  While Plaintiff was employed as a PSS at the Blue Pod,[16] he was disciplined by Center supervisors, formally and informally, on multiple occasions.  The earliest relevant discipline occurred on April 14, 2011.[17]  On this date, Plaintiff was given disciplinary counseling by an unknown supervisor for turning away a patient without consulting with the Blue Pod's clinic facilitator,

---

[10] *Id.*

[11] *Id.*

[12] *See generally* Defs.' Mot., Ex. B-2, "Robles' FMLA Application and Documents 2010-20139," ECF No. 48-10; *see also* Defs.' Mot., Ex. E, Pl.'s Dep. 97:3–23 (asserting Plaintiff was denied FMLA leave in late 2012 or early 2013 regarding a right hand injury).

[13] *See generally* Defs.' Mot., Ex. B-2.

[14] Pl.'s Resp., Ex. A-2, Pl.'s Dep. 73:25–74:1.

[15] *Id.* at 73:10–11, 74:16–23.

[16] Based on the provided disciplinary files, it is unclear whether incidents on January 9, 2013 and April 16, 2013 occurred at the Blue Pod.  However, this ambiguity does not affect the court's conclusions.

[17] Defendants have provided documentation of several disciplinary actions against Plaintiff as early as August 29, 2007.  *See* Defs.' Mot., Exs. A-3–A-6, ECF No. 48-3.  However, in a letter recommending Plaintiff's discharge from the Center, the earliest listed discipline is dated April 14, 2011.  *Id.*, Ex. A-12, "TTUHSC September 2013 Memo Recommending Robles' Termination" ("Discharge Recommendation"), ECF No. 48-3.  Therefore, the court will assume discipline occurring before April 14, 2011 did not factor into Plaintiff's termination.

and furthermore, a doctor complaining about how Plaintiff had addressed her patients.[18]  On September 12, 2011, Plaintiff was issued a "Letter of Disciplinary Reprimand" by Mary Olivas ("Olivas") for insubordinately addressing a clinic office manager, failing to register a patient at the Blue Pod for an immunization despite prior instructions, sending multiple patients to another area without confirming physicians were available there, and going to Human Resources two hours earlier than permitted (causing a disruption to clinic flow).[19]

Plaintiff was next disciplined on October 21, 2011, receiving a "Letter of Final Warning" from Olivas for refusing service to two patients whose primary physician was no longer at the pediatrics unit despite prior instructions, as well as for being insubordinate to a supervisor, clinic office manager, and associate clinic administrator.[20]  On January 9, 2013, Plaintiff was informally counseled, apparently by Maria Pedroza ("Pedroza"), regarding unacceptable behavior towards a coworker, on the grounds he "scold[ed her] and ma[de] inappropriate comments regarding her work in front of other employees and patients."[21]  On June 10, 2013, Plaintiff received a "Letter of Final Warning" from Pedroza regarding incidents on April 16, 2013.[22]  On that date, Plaintiff was asked by a superior to register a newborn patient.[23]  Instead, Plaintiff provided paperwork to his coworker and asked her to register the patient.[24] Although the coworker was about to go to lunch, she registered the patient before beginning her lunch hour

---

[18] *See* Defs.' Mot., Ex. A-7, "Robles' September 2011 Disciplinary Reprimand," at 1, ECF No. 48-3 (detailing these allegations as "incidents of previous counseling sessions").

[19] *Id.* at 1–2.

[20] Defs.' Mot., Ex. A-8, "Robles' October 2011 Letter of Final Warning," at 1–2, ECF No. 48-3.

[21] Defs.' Mot., Ex. A-9, "Robles' June 2013 Letter of Final Warning," at 2, ECF No. 48-3.

[22] *Id.* at 1–2.

[23] *Id.* at 1.

[24] *Id.*

at a Center lunch room.[25]  During lunch, Plaintiff called his coworker to the lunch room door and scolded

her in front of fellow employees for forgetting to sign in the patient and place a label on the patient list.[26]

After lunch, Plaintiff continued to make "inappropriate and sarcastic" comments to the coworker during

clinic hours, causing an argument that compelled a superior to intervene.[27]

 In the midst of these issues, Plaintiff made two unwritten requests to a supervisor for a reasonable

accommodation for his difficulties.[28]  Although Plaintiff does not recall the dates he made these requests,

he asserts they were made in late 2012 and early 2013.[29]  Both of these requests were for a transfer to an

operator position in the pediatrics unit's call center.[30]  Neither of these requests were granted, and there is

no indication alternative accommodations were proposed by Plaintiff or a supervisor.

 The final incident occurred on September 10, 2013.[31]  On that date, a parent arrived at the Blue

Pod to have her two ill children seen by their primary physician, a doctor who was no longer at the

Center.[32]  Plaintiff did not attempt to change the children's primary physician, but instead informed the

parent the Center would not see her children due to the doctor's departure.[33]  In addition, Plaintiff told the

parent her insurance would not pay for the visit, she would need to call the Center to change physicians,

and he would need to charge $60.00 because the absent doctor was listed as the children's primary

---

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] Pl.'s Resp., Ex. A-2, Pl.'s Dep. 104:9–24, ECF No. 54-2.

[29] *Id.* at 104:15–24.

[30] *Id.* at 105:3–17.

[31] Discharge Recommendation 2.

[32] *Id.*

[33] *Id.*

5

physician.[34]  After the parent complained to a supervisor, the supervisor had another employee change the

children's primary physician and the children were seen by a physician after returning to the Blue Pod.[35]

After this final incident, Alicia Gacharna ("Gacharna"), Administrator of the Center's pediatrics

unit, recommended Plaintiff's immediate dismissal on September 17, 2013 in light of the previously

enumerated misconduct.[36]  Plaintiff was subsequently terminated on September 24, 2013.[37]

> B.      *Procedural History*

After pursuing administrative relief with the Equal Employment Opportunity Commission

("EEOC"), Plaintiff filed suit against the Center on July 9, 2014 in the 384th District Court of El Paso

County, Texas.[38]  Plaintiff asserted claims against the Center pursuant to the Americans with Disabilities

Act (the "ADA") and Chapter 21 of the Texas Labor Code ("Chapter 21").[39]  His claims alleged the Center

was responsible for:  "(a) creating a hostile work environment[;] (b) refusing and failing to provide

Plaintiff with equal terms and conditions of employment, workplace and promotional opportunities, and

other advantages and privileges of employment provided for non-disabled employees; (c) refusing to

provide reasonable accommodations; (d) retaliating against Plaintiff for requesting reasonable

accommodations or for assertion of his rights, and interfering [with] or intimidating him from taking such

actions; (e) terminating Plaintiff because of his disabilities and his requests for accommodations; and (f)

---

[34] *Id.*  The Discharge Recommendation indicates the children were enrolled in a Medicaid plan, and furthermore, Medicaid patients cannot be charged for services.  *Id.*

[35] *Id.*

[36] *Id.* at 1–2.  The Discharge Recommendation also highlighted a February 13, 2013 performance evaluation, in which Plaintiff was scored as "[o]ccassionally below expectations" in the areas of "Interpersonal Skills," "Professionalism," and "Teamwork."  *Id.* at 1; *see also* Defs.' Mot., Ex. A-10, "Robles' 2012 Annual Performance Review," at 1–2, ECF No. 48-3.

[37] *See* Defs.' Mot., Ex. A-2, "Robles' September 24, 2013, Discharge Letter," ECF No. 48-3.

[38] "Defendants' Notice of Removal," Ex. 4, at 4, "Plaintiff's Original Petition" ("Original Petition"), ECF No. 1-4, filed Aug. 22, 2014.

[39] *Id.* at 7–9 ¶¶ 46–56.

failing to take prompt and equitable steps to remedy discrimination."[40]  Plaintiff's Original Petition requested a variety of legal, declaratory, and equitable relief against the Center for his ADA and Chapter 21 claims.[41]

Later the same day,[42] "Plaintiff's First Amended Petition" ("First Amended Petition") was filed.[43] The First Amended Petition joined two additional parties as defendants, both in their official capacities: Dr. Fuhrman, the Physician in Chief of the Center's pediatrics unit; and Tedd Mitchell, M.D. ("Dr. Mitchell"), the President of the Center.[44]  The First Amended Petition retained the ADA and Chapter 21 claims against the Center without significant alteration,[45] but added a disability discrimination claim against Dr. Fuhrman and Dr. Mitchell pursuant to the ADA.[46]  Other than limiting requested relief to attorney's fees and declaratory and equitable remedies,[47] the claims against the two individuals mirror the claims against the Center.  The Center, Dr. Fuhrman, and Dr. Mitchell removed the case on August 22, 2014.[48]

---

[40] *Id.* at 8–9 ¶ 53.  Plaintiff's testimony implies he believes opposing parties' wrongdoing is attributable to his depression as well as his HIV.  *See, e.g.*, Pl.'s Resp., Ex. A-2, Pl.'s Dep. 133:8–13 (asserting Plaintiff's requests for reasonable accommodations were made because of his "HIV medication and his depression").  However, Plaintiff's Response focuses on asserted links between his HIV and his discipline and termination.  *See, e.g.*, Pl.'s Resp. 17 (contending Defendants "have been aware of Plaintiff's disability (being HIV positive) since the initiation of his employment") (parenthetical phrase in original).  Even when Plaintiff's mental health is accounted for, the Order's analysis remains the same.

[41] Original Pet. 9 ¶ 54.

[42] *See* Defs.' Notice Removal, Ex. 4, at 2, "Register of Actions" (recording both an "Original Petition" and an "Amended Petition" as being filed on July 9, 2014).

[43] Defs.' Notice Removal, Ex. 4, at 21, First Am. Pet.

[44] *Id.* at 2 ¶¶ 6–7.

[45] *Id.* at 8–10 ¶¶ 48–58.

[46] *Id.* at 10–11 ¶¶ 59–68.

[47] *Id.* at 11 ¶ 67.

[48] *See* Defs.' Notice Removal, ECF No. 1.

On October 23, 2014, Plaintiff filed his Second Amended Complaint.[49]  The Second Amended Complaint substituted Dr. Lange (in his official capacity) as a defendant for Dr. Mitchell, as Dr. Lange had recently succeeded Dr. Mitchell as the Center's President.[50]  The Second Amended Complaint lists three claims:  (1) disability discrimination against the Center pursuant to the ADA;[51] (2) disability discrimination against Dr. Fuhrman and Dr. Lange, in their official capacities, pursuant to *Ex Parte Young*[52] and the ADA;[53] and (3) disability discrimination against Defendants pursuant to section 504 of the Rehabilitation Act.[54]  Each claim alleges Defendants: "(a) discriminat[ed] against Plaintiff[;] (b) refus[ed] and fail[ed] to provide Plaintiff with equal terms and conditions of employment, workplace and promotional opportunities, and other advantages and privileges of employment provided for non-disabled employees; (c) refus[ed] to provide reasonable accommodations; (d) culminating in the wrongful termination of Plaintiff due to his disability despite Plaintiff's repeated efforts to assert his rights as an employee; [and (e)] fail[ed] to take prompt and equitable steps to remedy discrimination."[55]  As with his previous pleadings, Plaintiff requested a variety of legal, equitable, and declaratory remedies for his claims.[56]  Defendants answered the Second Amended Complaint on November 6, 2014.[57]

---

[49] Although the filing's text describes it as Plaintiff's "Second Amended Complaint," the filing is erroneously styled "Plaintiff's First Amended Petition."  ECF No. 11.

[50] Second Am. Compl. 2–3 ¶ 7.

[51] *Id.* at 9–11 ¶¶ 50–59.

[52] 209 U.S. 123 (1908).

[53] Second Am. Compl. 11–13 ¶¶ 60–69.

[54] *Id.* at 14–16 ¶¶ 70–80.

[55] *See, e.g.*, *id.* at 10 ¶ 57 (making the enumerated allegations against the Center under the ADA).  Plaintiff's Rehabilitation Act claim further alleges Defendants' wrongful actions were intentional.  *Id.* at 15 ¶ 78.

[56] *Id.* at 16–17 ¶ 82.

[57] *See* "Defendants' Original Answer and Affirmative Defenses to Plaintiff's Second Amended Complaint," ECF No. 13.  Although the Center, Dr. Fuhrman, and Dr. Mitchell jointly filed an answer in state court, the November 6th filing was the first pleading jointly filed by the Center, Dr. Fuhrman, and Dr. Lange.  *See* Defs.'

Defendants filed their Motion on July 15, 2015, seeking to dismiss Plaintiff's Second Amended Complaint in its entirety.  Plaintiff has responded to the Motion, and Defendants have replied.

## II.    PARTIES' ARGUMENTS

### A.    Defendants' Arguments

Defendants have six arguments against Plaintiff's claims.  First, Defendants contend the court lacks subject matter jurisdiction over Plaintiff's failure-to-accommodate claims as Plaintiff has not exhausted them with the EEOC.[58]  Second, Defendants aver Plaintiff's failure-to-accommodate claims fail because, insofar as Plaintiff requested an accommodation, he never made a reasonable proposal.[59]  Third, Defendants contend Plaintiff's termination-related Rehabilitation Act claims fail because Plaintiff has conceded his termination was not entirely attributable to his disability.[60]  Fourth, Defendants argue Plaintiff's ADA claims pursuant to *Ex Parte Young* should be dismissed as he is not qualified for reinstatement.[61]  Fifth, Defendants aver Plaintiff cannot establish a *prima facie* case for any of his disability discrimination claims as he cannot identify a similarly situated, non-disabled coworker who was treated more favorably.[62]  Finally, Defendants assert there were legitimate, non-discriminatory reasons for Plaintiff's discipline and termination.[63]

### B.    Plaintiff's Arguments

Plaintiff contends his failure-to-accommodate claims are "sufficiently encapsulate[d]" in his

---

Notice Removal, Ex. 4, at 49, "Defendants' Original Answer and Affirmative Defenses."

[58] Defs.' Mot. 9–11.  Alternatively, Defendants contend Plaintiff should be judicially estopped from asserting failure-to-accommodate claims based on statements made in his EEOC filings.  *Id.* at 10.

[59] *Id.* at 11–12.

[60] *Id.* at 12–15.

[61] *Id.* at 15–16.

[62] *Id.* at 16–18.

[63] *Id.* at 18–20.

EEOC filings, such that they have been exhausted with the agency.[64]  Furthermore, even if Plaintiff's requested accommodations were not reasonable, Defendants had and ignored a duty to "engage in a conversation with Plaintiff" as to how he could be accommodated.[65]  Plaintiff asserts his current condition and experience at the Center qualify him for his previous position and others.[66]  Plaintiff avers the differing disciplinary records of multiple coworkers, despite their committing the same errors as Plaintiff, demonstrates similarly situated coworkers were treated more favorably, thereby evincing discrimination.[67]  Finally, Plaintiff contends that evidence regarding his requests for investigation into discrimination allegations, as well as internal discussions about his FMLA leaves, creates a fact issue sufficient to prevent summary judgment.[68]

Although Plaintiff's Response does not address Defendants' Rehabilitation-Act-specific argument, Plaintiff does not expressly concede Defendants are entitled to summary judgment on his Rehabilitation Act claims.

## III.    <u>APPLICABLE LAW</u>

Summary judgment should be granted only where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[69]  "A genuine issue of material fact exists when there is evidence sufficient for a rational trier of fact to find for the

---

[64] Pl.'s Resp. 7–8, 17–19.

[65] *Id.* at 19–20.

[66] *Id.* at 16 & n.57 (citing *id.*, Ex. A-2, at 112; Pl.'s Resp., Ex. F, "Affidavit," ECF No. 54-8).

[67] *Id.* at 11–12.

[68] *Id.* at 12–15.  Plaintiff also argues that six depositions, previously found to be inadmissible, should be "made available to Plaintiff for use in his [Response]."  *Id.* at 2–3; *see also* "Order Denying Plaintiff's Motion for Reconsideration," at 3–6, ECF No. 52, entered July 20, 2015 (upholding exclusion of six depositions due to multiple defects, including a coworker relationship between the deposition officer and Plaintiff's counsel).  As Plaintiff's Response advances no new arguments favoring the depositions' admissibility, Plaintiff's request is denied.

[69] Fed. R. Civ. P. 56(a).

non-moving party."[70]  The substantive law defines whether disputed facts are material.[71]  The party moving

for summary judgment bears an initial burden of identifying those portions of the pleadings and any

discovery on record, including any admissions on file, which he or she believes demonstrate the absence of

a genuine issue of material fact.[72]  The court will "view all facts in the light most favorable to the

non-moving party"[73] and draw all factual inferences in the nonmovant's favor.[74]  If the moving party

cannot demonstrate the absence of a genuine issue of material fact, summary judgment is inappropriate.[75]

     If the movant does meet this burden, however, the nonmovant must "go beyond the pleadings and

by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate

specific facts showing that there is a genuine issue for trial."[76]  Accordingly, the "burden is not satisfied

with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated

assertions, or by only a scintilla of evidence."[77]  "[T]he nonmovant may not rely on mere allegations in the

pleadings; rather, the nonmovant must respond to the motion for summary judgment by setting forth

particular facts indicating that there is a genuine issue for trial."[78]  The court does not, "in the absence of

any proof, assume that the nonmoving party could or would prove the necessary facts."[79]  "If the

---

[70] *Perez v. Region 20 Educ. Serv. Ctr.*, 307 F.3d 318, 323 (5th Cir. 2002) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)).

[71] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[72] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[73] *Blow v. City of San Antonio, Tex.*, 236 F.3d 293, 296 (5th Cir. 2001).

[74] *Cheatham v. Allstate Ins. Co.*, 465 F.3d 578, 582 (5th Cir. 2006).

[75] *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995).

[76] *Celotex*, 477 U.S. at 324 (internal quotation marks omitted).

[77] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted) (internal quotation marks omitted).

[78] *Spivey v. Robertson*, 197 F.3d 772, 774–75 (5th Cir. 1999) (citing *Anderson*, 477 U.S. at 248–49).

[79] *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

nonmovant fails to meet this burden, then summary judgment is appropriate."[80]

In reviewing the parties' submissions, the court does not "weigh the evidence or evaluate the credibility of witnesses."[81]  The court will consider only evidence in the record that would be admissible at trial.[82]  Summary judgment is appropriate when there is "a complete failure of proof concerning an essential element of the [nonmovant's] case."[83]  However, if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," summary judgment is not warranted.[84]

## IV.  **DISCUSSION**

Plaintiff is advancing claims pursuant to the ADA and section 504 of the Rehabilitation Act.  For the most part, employment discrimination claims under each statute "are judged under the same legal standards, and the same remedies are available under both [statutes]."[85]  The most notable exception to this rule relates to causation.  Whereas the ADA requires a disability to be a "motivating factor" for an adverse employment decision,[86] section 504 of the Rehabilitation Act requires a plaintiff to prove his disability was the sole cause of an adverse employment decision.[87]  To the extent Plaintiff's Rehabilitation Act claims survive summary judgment, his ADA claims must also survive due to their less arduous causation requirement.  Conversely, if Plaintiff's ADA claims fail to survive summary judgment, his Rehabilitation Act claims must also fail.  As Plaintiff's Rehabilitation Act claims depend on the survival of his ADA

---

[80] *Tubacex*, 45 F.3d at 954.

[81] *Caboni v. Gen. Motors Corp.*, 278 F.3d 448, 451 (5th Cir. 2002).

[82] *Fowler v. Smith*, 68 F.3d 124, 126 (5th Cir. 1995).

[83] *Celotex*, 477 U.S. at 322.

[84] *Anderson*, 477 U.S. at 248.

[85] *Kemp v. Holder*, 610 F.3d 231, 234 (5th Cir. 2010) (per curiam) (citation omitted).

[86] *Pinkerton v. Spellings*, 529 F.3d 513, 519 (5th Cir. 2008) (per curiam).

[87] *Id.* at 516.

claims, the ADA claims will be analyzed first.

     *A.*      *ADA Claims*

The ADA prohibits "discriminat[ion] against a qualified individual on the basis of disability in regard to . . . discharge of employees . . . and other terms, conditions, and privileges of employment."[88]

Although Plaintiff's Second Amended Complaint lists all of his ADA claims under the umbrella of "disability discrimination," the substance of his claims is slightly more elaborate.  Essentially, Plaintiff's ADA claims take two forms:  (1) Defendants disciplined, terminated, and otherwise discriminated against him due to his HIV ("disparate treatment"); and (2) Defendants failed to accommodate his medical condition ("failure-to-accommodate").  As the Fifth Circuit has observed, "[a] failure-to-accommodate claim under the ADA is distinct from a claim of disparate treatment."[89]  Accordingly, in order to fully evaluate Plaintiff's disability discrimination claims, the court must independently analyze them under disparate treatment and failure-to-accommodate frameworks.  The disparate treatment allegations will be analyzed first.

     1.     <u>Disparate Treatment</u>

In a disparate treatment case under the ADA, "the employee may either present direct evidence that [he] was discriminated against because of [his] disability or alternatively proceed under the burden-shifting analysis first articulated in *McDonnell Douglas Corp. v. Green*."[90]  The *McDonnell Douglas* burden-shifting analysis first requires a plaintiff to establish "a prima facie case of discrimination."[91]  "To establish a prima facie discrimination claim under the ADA, a plaintiff must prove:  (1) that he has a

---

[88] 42 U.S.C. § 12112(a).

[89] *Windhauser v. Bd. of Supervisors for La. State U. & Agric. & Mech. Coll.*, 360 F. App'x 562, 565 (5th Cir. 2010) (per curiam) (unpublished) (citing 42 U.S.C. §§ 12112(a), (b)(5)(A)).

[90] *See E.E.O.C. v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014) (applying this standard to a claim for discriminatory termination), *see also McDonnell Douglas*, 411 U.S. 792 (1973).

[91] *LHC Grp.*, 773 F.3d at 694.

disability; (2) that he was qualified for the job; and (3) that he was subject to an adverse employment decision on account of his disability."[92]  If the plaintiff fulfills his burden, the burden shifts to defendants, who "must articulate a legitimate, nondiscriminatory reason" for the adverse employment decision.[93]  If this burden is satisfied, "the burden shifts back to the [plaintiff] to show that [the defendants'] proffered reason is pretextual."[94]

Plaintiff's Response contends discriminatory treatment took two forms during his time at the Center:  (1) discipline attributable to his disability;[95] and (2) his termination.[96]  After due consideration, the court will assume Plaintiff is able to establish a prima facie case of discrimination under the ADA for all of Defendants' contested actions.  Therefore, Defendants' proffered reasons for their contested actions must be analyzed.

> a.       *Defendants' Proffered Reasons*

Once a plaintiff establishes a *prima facie* case of disability discrimination, defendants can fulfill their shifted burden by "articulat[ing] a nondiscriminatory reason with sufficient clarity to afford the employee a realistic opportunity to show that the reason is pretextual."[97]

---

[92] *Id.* at 697 (quoting *Zenor v. El Paso Healthcare Sys., Ltd.*, 176 F.3d 847, 853 (5th Cir. 1999)) (internal punctuation marks omitted).  The *LHC Group* court implied this formulation is favored whenever "plaintiffs may draw on their employment history to prove a nexus between their protected trait and [an adverse employment decision]."  *Id.* at 696.  Accordingly, this formulation encompasses Plaintiff's allegations of discriminatory discipline and discriminatory discharge.

[93] *Id.* at 694.

[94] *Id.*

[95] *See, e.g.*, Pl.'s Resp. 5 (contending "management . . . would single [Plaintiff] out and discipline him harshly for alleged errors and/or mistakes which were being made by most coworkers, few of whom were ever disciplined like Plaintiff was, and none of whom received the harsh consequences and reprimands issued to Plaintiff by management"); *id.* at 17 (contending Plaintiff suffered side effects from HIV medication, thereby affecting his behavior at work).

[96] *See id.* at 16 (averring Plaintiff can demonstrate Defendants subjected him to "adverse employment acts," specifically "disparate treatment regarding discipline and ultimate termination").

[97] *Patrick v. Ridge*, 394 F.3d 311, 317 (5th Cir. 2004) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255–56 (1981)) (internal quotation marks and emphasis removed).

Central to Defendants' case is a set of files documenting discipline taken against Plaintiff between April 2011 and September 2013.  These incidents consist of repeated infractions regarding patient service, record keeping, coworker relations, and insubordination.  Defendants contend that the allegations made in the documents comprise legitimate reasons not only for Plaintiff's discipline, but also his termination.[98]

Although Plaintiff contends his discipline was unjust, he does not dispute the underlying incidents actually occurred.[99]  Even assuming the disciplinary documents contain some inaccuracies, they still satisfy Defendants' burden of production.  The issue here is not whether Defendants' assessment of Plaintiff's performance is accurate, but whether their "perception of [his] performance, accurate or not, was the real reason for [Plaintiff's discipline and] termination."[100]  As Defendants have presented evidence that Plaintiff's performance was viewed to be poor,[101] they have satisfied their burden of articulating a legitimate reason for Plaintiff's discipline and termination.[102]

####   b.   Pretext Analysis

To survive summary judgment, Plaintiff must "produce substantial evidence indicating that the

---

[98] Defs.' Mot. 18–20.

[99] Pl.'s Resp. 10.

[100] *Shackleford v. Deloitte & Touche, LLP*, 190 F.3d 398, 408–09 (5th Cir. 1999) (emphasis removed). Similarly, whether Plaintiff's supervisors had personal, rather than secondhand, knowledge of these incidents is irrelevant, as the accuracy of supervisors' beliefs does not affect whether their beliefs are the real reason for their actions.  *See Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 899 (5th Cir. 2002) (citing *Evans v. City of Hous.*, 246 F.3d 344, 355 (5th Cir. 2001)) ("The issue at the pretext stage is whether [the defendant's] reason, even if incorrect, was the real reason for [the plaintiff's] termination.").

[101] Plaintiff has submitted multiple notes from patients and children praising his performance.  *See generally* Pl.'s Resp., Ex. E, ECF No. 54-7.  Plaintiff contends these documents "create a genuine issue of fact as to whether Plaintiff deserved the level of discipline he received."  Pl.'s Resp. 13.  This argument is not persuasive, as Plaintiff's documents do not dispute whether Defendants perceived his overall performance as warranting discipline or termination.

[102] *See Feist v. La., Dep't of Justice, Office of the Att'y Gen.*, 730 F.3d 450, 455 (5th Cir. 2013) (holding a defendant satisfied its burden on summary judgment for a retaliation claim by providing two examples of a plaintiff's "substandard work").

proffered legitimate nondiscriminatory reason[s are] a pretext for discrimination."[103]  Plaintiff has made a variety of arguments that he claims demonstrate pretext.  Each of these will be examined in turn.

### i.    Treatment of Similarly Situated Coworkers

Plaintiff contends multiple workers were treated more favorably with regard to discipline "despite committing identical errors [as] Plaintiff."[104]  Although Plaintiff's Response advances a variety of evidence in support of his contention, none of it creates a factual issue.

To support a claim of disparate treatment, a plaintiff may present evidence that a similarly situated coworker was given more favorable treatment.[105]  The Fifth Circuit elaborated on what satisfies the criterion of being "similarly situated" in *Lee v. Kansas City Southern Railway Co.*:

> Employees with different supervisors, who work for different divisions of a company or who were the subject of adverse employment actions too remote in time from that taken against the plaintiff generally will not be deemed similarly situated.  Likewise, employees who have different work responsibilities or who are subjected to adverse employment action for dissimilar violations are not similarly situated.  This is because we require that an employee who proffers a fellow employee as a comparator demonstrate that the employment actions at issue were taken 'under nearly identical circumstances.'  The employment actions being compared will be deemed to have been taken under nearly identical circumstances when the employees being compared held the same job or responsibilities, shared the same supervisor or had their employment status determined by the same person, and have essentially comparable violation histories.  And, critically, the plaintiff's conduct that drew the adverse employment decision must have been 'nearly identical' to that of the proffered comparator who allegedly drew dissimilar employment decisions.[106]

Plaintiff identifies multiple coworkers as having been "disciplined by new management put in place after Plaintiff's termination," and in support, has submitted multiple disciplinary documents signed after his

---

[103] *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003) (citation omitted).

[104] Pl.'s Resp. 12.

[105] *See Abarca v. Metro. Transit Auth.*, 404 F.3d 938, 941 (5th Cir. 2005) (per curiam) (finding a plaintiff failed to establish a prima facie case of discrimination as he "failed to identify any employee with whom he was similarly situated, but who was treated more favorably").

[106] 574 F.3d 253, 259–60 (5th Cir. 2009) (footnotes and citations omitted).

termination.[107]   However, by Plaintiff's own admission, these coworkers could not have been similarly situated when they were disciplined, as their discipline was carried out by different supervisors.[108] Furthermore, although Plaintiff contends his coworkers were subsequently making "identical errors [as] Plaintiff,"[109] the documents accompanying Plaintiff's Response do not indicate any errors having to do with insubordination or workplace arguments with coworkers.[110]   Therefore, Plaintiff has failed to demonstrate the subsequent discipline encompassed conduct nearly identical to that of Plaintiff. Accordingly, the subsequent disciplinary actions cannot create an issue of material fact.

In deposition testimony, Plaintiff asserted errors made by three coworkers (Alex Perez, Isela Seanez, and Alma Martinez) during his employment were left unpunished, which Plaintiff contends is evidence of disparate treatment.[111]   However, Plaintiff has not shown that even one of these coworkers was similarly situated during his employment.   Although Plaintiff asserted Perez was "rude to patients . . . [a]ll the time,"[112] Plaintiff fails to indicate Perez had problems with being rude to coworkers, committing record keeping errors, or being insubordinate.   Plaintiff's deposition did not elaborate on Seanez's misbehavior beyond testifying she had "trouble with patients or [primary care physicians],"[113] and furthermore, the only

---

[107] Pl.'s Resp. 11–12; *see also id.*, Ex. D, ECF No. 54-6.

[108] The Response's disciplinary documents allude to only one disciplinary incident occurring during Plaintiff's employment.   Specifically, one document noted Cynthia Lopez had received a "Letter of Final Warning" on November 7, 2012 from an unknown supervisor for "[f]ailure to follow Inter-Departmental Policy (Absenteeism) [and] excessive and unexpected absences/tardies."   Pl.'s Resp., Ex. D, at 17.   As Cynthia Lopez's alleged misconduct was not substantially similar to Plaintiff's alleged misconduct, this isolated instance is irrelevant. *Compare id.* at 6–18 (documenting incidents associated with Cynthia Lopez's absences, tardies, and misuse of the Center's phone system), *with* Defs.' Mot., Exs. A-7–A-9, A-11–A-12 (documenting Plaintiff's incidents associated with insubordination, rudeness, patient service deficiencies, and record keeping errors).

[109] Pl.'s Resp. 12.

[110] *See generally id.*, Ex. D.

[111] Pl.'s Resp., Ex. A-3, Pl.'s Dep. 255:23–257:14, ECF No. 54-3; *see also* Pl.'s Resp. 8–9.   Although the deposition transcript spells Seanez's name as "Isela Saenz," disciplinary documents identify her as "Isela Seanez."

[112] Pl.'s Resp., Ex. A-3, Pl.'s Dep. 256:8–15.

[113] *Id.* at 255:23–256:5.

17

disciplinary documents he has provided for Seanez do not evince rudeness or insubordination issues (although they do point to difficulties with record keeping and the Center's phone system).[114]  Finally, although Plaintiff asserted Martinez had problems with record keeping,[115] and furthermore, has provided evidence Martinez was habitually tardy (after Plaintiff's termination, at least),[116] he has provided no evidence Martinez ever had problems with rudeness or insubordination.  Therefore, none of Plaintiff's specified coworkers were similarly situated to him during his employment.

Finally, Plaintiff makes blanket statements that coworkers generally were not being disciplined for "identical mistakes."[117]  As Plaintiff has failed to point to even one similarly situated coworker who was treated more favorably, Plaintiff cannot create a factual issue solely with his belief that discrimination occurred.[118]  Therefore, Plaintiff's arguments about his coworkers' alleged errors and discipline do not refute Defendants' proffered reasons for adverse employment actions.

ii.  <u>Failure to Investigate</u>

Although Plaintiff has not shown discrimination regarding his coworkers' treatment, Plaintiff contends discriminatory animus is indicated by his supervisors declining to investigate his allegations of discrimination.

Plaintiff has advanced a purported excerpt of Defendants' policy regarding corrective actions, which states: "[c]orrective actions should be administered using sound management practices

---

[114] Pl.'s Resp., Ex. D, at 2–3.

[115] Pl.'s Resp., Ex. A-3, Pl.'s Dep. 257:10–14.

[116] Pl.'s Resp., Ex. D, at 23.

[117] Pl.'s Resp. 12; *see also id.*, Ex. A-2, Pl.'s Dep. 238:4–19 (asserting Plaintiff had personal knowledge that his coworkers were not disciplined despite "having issues with patients").

[118] *See Bauer v. Albemarle Corp.*, 169 F.3d 962, 967 (5th Cir. 1999) (quoting *E.E.O.C. v. La. Office of Cmty. Servs.*, 47 F.3d 1438, 1448 (5th Cir. 1995)) ("This court has consistently held that an employee's 'subjective belief of discrimination' alone is not sufficient to warrant judicial relief.").

including . . . conducting a thorough investigation of the concern or event."[119]  Plaintiff alleges that even

though he complained to supervisors on multiple occasions that he was suffering discrimination, they never

investigated his claims.[120]  Assuming Plaintiff's assertions are accurate, Defendants' failures to investigate

constitute an arbitrary inconsistency with their policy.

Even so, this does not demonstrate pretext.  "Although an employer's failure to follow its own

policies may be probative of discriminatory intent, [courts] require discharged employees in discrimination

cases to show, in addition, that they were treated differently from [other] employees."[121]  Plaintiff has

presented no evidence that other employees were granted investigations in response to allegations of

discrimination.  Therefore, even if Defendants refused to investigate Plaintiff's allegations, this does not

demonstrate Defendants discriminated against Plaintiff in doing so.

As Plaintiff has failed to present evidence of discriminatory animus in Defendants' investigatory

failures, he has not fulfilled his burden to show Defendants' proffered reasons were pretextual.

### iii.   Leave-Related Emails

The final pretextual argument advanced by Plaintiff's Response centers on a set of emails

concerning Plaintiff's FMLA leave between mid-2011 and mid-2012.  Although Plaintiff has not pleaded

any claims pursuant to the FMLA,[122] he contends these emails evince unlawful discrimination under the

---

[119] Pl.'s Resp. 13 n.49.  Plaintiff has not included an official copy of the policy with his Response.  As Defendants have not contended Plaintiff has quoted their policy inaccurately, the court accepts this version as official.

[120] *Id.* at 12–13; *see also id.*, Ex. A-2, Pl.'s Dep. 82:15–20 (internal quotation marks omitted) (stating he complained to supervisors on the grounds that they only disciplined him even though he "kn[e]w for a fact" they left coworkers' misconduct unpunished).

[121] *Hamilton v. AVPM Corp.*, 593 F. App'x 314, 321 (5th Cir. 2014) (per curiam) (unpublished) (citing *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 346 (5th Cir. 2007)).

[122] Furthermore, Plaintiff has disclaimed any intent to pursue FMLA claims.  *See* Pl.'s Resp. 14 ("Plaintiff's [Second] Amended Complaint does not allege a cause of action of FMLA violation and/or retaliation.").

ADA.[123]

     As an initial matter, it appears the FMLA leave encompassed by these emails is not related to HIV. Rather, it appears the discussed leave is associated with a right arm fracture and carpal tunnel syndrome in Plaintiff's right wrist and/or hand.[124]  Even though Plaintiff has not pleaded any of the conditions associated with the discussed FMLA leave, the emails may still be relevant to disparate treatment.  To the extent the emails evince discrimination on the basis of an unpleaded condition, the court will assume they also evince discrimination on the basis of Plaintiff's HIV.

     The earliest provided email, from Karen Givan to Mary Olivas,[125] is dated May 18, 2012 and discusses a "discrepancy" in the amount of FMLA leave Plaintiff was taking.  The email states that Plaintiff "is only eligible for 144 FMLA hours since he has previously used 336 hours within the last year."[126]  Based on this calculation and Plaintiff's ongoing leave, Givan declared that Plaintiff would "no longer be protected under [the] FMLA" after June 7, 2012.[127]  The email concluded by advising Olivas to "contact [her] local [Human Resources] office to discuss [Plaintiff's] employment status" after June 7th.[128]

     On June 5, 2012, Olivas forwarded Givan's email (and other emails not included in the record) to Alicia Gacharna.  Olivas's email declared that "[d]uring [Plaintiff's] FMLA absence, [they were] having to

---

[123] *Id.* at 14–15.  The emails have been provided as Exhibit C to Plaintiff's Response.  *See* ECF No. 54-5.

[124] If the timeframe is extended to the start of 2011, it encompasses problems with Plaintiff's rotator cuff and shoulders.  *See* Defs.' Mot., Ex. B-2, at 1–13.

[125] Natalie Campa, Laura Rodriguez, and Lupe Sierra were contemporaneously sent copies of the email.

[126] Pl.'s Resp., Ex. C, at 2.  Plaintiff has testified his supervisors at one point miscalculated the amount of FMLA leave he took, possibly during the period discussed in the emails.  Pl.'s Resp., Ex. A-2, Pl.'s Dep. 99:13–100:7.  However, Plaintiff does not detail the basis for his assertion other than stating he and his counsel made their own, undescribed, calculation.  *Id.* at 99:23–100:3.

[127] Pl.'s Resp., Ex. C, at 2.

[128] *Id.*

pull staff from other pods to cover the Blue Pod."[129]  The email went on to state that "[t]he Blue Pod is a very high patient volume clinic [and] needs two PSS's at all times for effective and efficient patient flow."[130]

Later that day, Gacharna emailed Lupe Sierra in response to Givan's and Olivas's emails. Therein, Gacharna inquired whether they could "move forward with separation on [Plaintiff] since [they] need[ed] to fill the position and have someone working the blue pod as soon as possible."[131]  Sierra's response, sent roughly two hours later,[132] reads as follows:

> Last year around this time, we were given a directive from Lubbock not to submit [a] Request for Separation for Employment on employees who expired all leave entitlements, including but not limited to FMLA.  We need to explore other options on employees who do expire their leave entitlement before any consideration for separation of employment is recommended.  In [Plaintiff's] case, his FMLA entitlement expires June 7, 2012, his Health Care Certification form has an estimated date of return of June 17, 2012.  Since it[']s within two weeks, we can follow up then and see if he can perform any of [] his essential job functions.  Please let me know if you have any questions.[133]

No other emails in this chain have been provided.

Viewed in the light most favorable to Plaintiff, the emails contain two potential bases of pretext: (1) Gacharna's request to terminate Plaintiff for his excessive leave and prolonged absence; and (2) Sierra's recommendation to determine whether Plaintiff could perform his "essential job functions" once he returned.  After due consideration, neither of these bases is sufficient for Plaintiff's ADA disparate treatment claim to survive summary judgment.

In order to prevail on a claim for disparate treatment, Plaintiff must prove he is a qualified individual, meaning he is able to perform his job's essential functions with or without reasonable

---

[129] *Id.*

[130] *Id.*

[131] *Id.* at 1.

[132] Copies of this email were sent to Rebecca Salcido and Laura Rodriguez.

[133] Pl.'s Resp., Ex. C, at 1.

accommodation.[134]  It is beyond dispute that an essential function of a PSS is to be present at the Center on a regular basis.[135]  Furthermore, there is no indication a reasonable accommodation was available to allow Plaintiff to perform his PSS job, or any other job, while absent from the Center.  Because of Plaintiff's prolonged leave, he was unable to be at the Center and, consequently, unable to perform the essential job function of being present at the Center.  This situation is analogous to one the Fifth Circuit analyzed in *Hypes ex rel. Hypes v. First Commerce Corp.*

In *Hypes*, the court observed a plaintiff, raising disability discrimination claims under the ADA and Louisiana law, was clearly fired for excessive absence.[136]  In addition, the court acknowledged that excessive absence could be "a pretext or even a proxy for [the plaintiff's] disability, [such that] he would have an arguable claim under the ADA and [Louisiana law]."[137]  But even with this assumption, Plaintiff's claims still failed because Plaintiff's excessive absences made him not otherwise qualified for his job.[138]

Even though Plaintiff's excessive leave may have been associated with a disability, Defendants could still seek to terminate him on this basis without violating the ADA,[139] as Plaintiff's absences made him not otherwise qualified for his PSS position.  Accordingly, Gacharna's request to terminate Plaintiff during his prolonged absence does not show discrimination under the ADA.

---

[134] *LHC Grp.*, 773 F.3d at 697 (citation omitted); *Hypes ex rel. Hypes v. First Commerce Corp.*, 134 F.3d 721, 726 (5th Cir. 1998) (per curiam).

[135] *See* PSS Position Description 1 (stating that a PSS's "[w]ork is performed in usual clinic conditions and requires a high degree of contact with patients [and Center] staff"); *see also Hypes*, 134 F.3d at 727 (citing *Rogers v. Int'l Marine Terminals, Inc.*, 87 F.3d 755, 759 (5th Cir. 1996); *Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*, 31 F.3d 209, 213 (4th Cir. 1994); *Law v. U.S. Postal Serv.*, 852 F.2d 1278, 1279–80 (Fed. Cir. 1988) (per curiam); *Walders v. Garrett*, 765 F. Supp. 303, 309–10 (E.D. Va. 1991), *aff'd*, 956 F.2d 1163 (4th Cir. 1992); *Santiago v. Temple Univ.*, 739 F. Supp. 974, 979 (E.D. Pa. 1990), *aff'd*, 928 F.2d 396 (3d Cir. 1991)) ("Other courts are in agreement that regular attendance is an essential function of most jobs.").

[136] *Hypes*, 134 F.3d at 726.

[137] *Id.*

[138] *Id.* at 726–27.

[139] No opinions are intended regarding whether Plaintiff's allegations would support an FMLA claim.  As Plaintiff has not asserted any claims pursuant to the FMLA, this issue is moot.

Similarly, Sierra's suggestion to evaluate whether Plaintiff could perform essential job functions does not evince discriminatory intent.  Although Sierra's email implies action may be taken if Plaintiff was no longer qualified to be a PSS, it does not indicate such action would be taken if Plaintiff could perform his essential job functions after returning.  Furthermore, as Plaintiff's prolonged absence and underlying medical conditions were reasonable grounds for doubting whether he could perform as a PSS,[140] Sierra's suggestion cannot be evidence of discrimination.[141]

As there is nothing in the emails supporting discrimination, and furthermore, Plaintiff has otherwise failed to show pretext, he has not shown Defendants' proffered reasons were pretextual. Therefore, Defendants are entitled to summary judgment on Plaintiff's ADA claim for disparate treatment.

### 2.   Failure to Accommodate

Even though Plaintiff has not adequately supported his ADA claim for disparate treatment, his ADA failure-to-accommodate claim requires a different analysis.  Even assuming Plaintiff was not a qualified individual for his PSS position, he could demonstrate he would be a qualified individual with a reasonable accommodation, including reassignment to a vacant position for which he is qualified.[142]  To the extent Defendants failed to accommodate Plaintiff's disability, Plaintiff could have an actionable ADA claim.[143]  However, even if Plaintiff can otherwise adequately prove his failure-to-accommodate claim, Defendants are entitled to summary judgment, as Plaintiff has not exhausted the claim with the EEOC.

---

[140] For Plaintiff's then-ongoing FMLA leave, Plaintiff's physician asserted Plaintiff could perform "no work" during treatment of his carpal tunnel syndrome. Defs.' Mot., Ex. B-2, at 12.

[141] *See Owusu–Ansah v. Coca–Cola Co.*, 715 F.3d 1306, 1312 (11th Cir. 2013) (holding a fitness-for-duty evaluation was valid under the ADA as the employer "had a reasonable, objective concern about [the plaintiff's] mental state, which affected job performance"); *Butler v. La. Dep't of Pub. Safety & Corrections*, No. 3:12-CV-00420-BAJ-RLB, 2013 WL 2407567, at *6 (M.D. La. May 29, 2013) (citing *Brownfield v. City of Yakima*, 612 F.3d 1140, 1146 (9th Cir. 2011); *Sullivan v. River Valley Sch. Dist*, 197 F.3d 804, 811 (6th Cir. 1999)) ("To show Plaintiff's psychiatric evaluation complied with the ADA, Defendants must demonstrate they had reason to believe Plaintiff could not safely perform the job prior to the evaluation.").

[142] 42 U.S.C. § 12111(9)(B).

[143] *Id.* § 12112(b)(5)(A).

The ADA incorporates the exhaustion requirements applicable to claims brought under Title VII of the Civil Rights Act of 1964 ("Title VII").[144]  Accordingly, ADA claims are properly raised in a judicial complaint when they are within "the scope of the EEOC investigation which can reasonably be expected to grow out of the [administrative] charge of discrimination."[145]  Failure to comply with the ADA's exhaustion requirements is grounds for dismissal.[146]

Plaintiff submitted a Charge of Discrimination ("EEOC Complaint") to the EEOC on March 27, 2014.  On the form, Plaintiff marked a box for discrimination based on disability and described the particulars of his case as follows:

> I have been employed by [the Center] since June 1996.  My last position was Patient Service Specialist working under the [s]upervision of Mary Olivas.
>
> Since the beginning of my employment, [the Center] has been aware of my medical condition.  Over the last three or so months, I have experienced side effects, due to my medication, that have affected my behavior at work.
>
> I was terminated from my employment on September 24, 2013 by Alicia L. Gacharna/Administrator and Ms. Olivas for alleged performance issues.
>
> I believe I have been discriminated against in violation of the [ADA], and as amended by the [ADA Amendments Act] of 2008.[147]

On its face, the EEOC Complaint specifies only one unlawful act by Defendants or affiliated persons: Plaintiff's September 24, 2013 termination.  However, Plaintiff asserts the final sentence, generally

---

[144] *Dao v. Auchan Hypermarket*, 96 F.3d 787, 789 (5th Cir. 1996) (per curiam).

[145] *See Pacheco v. Mineta*, 448 F.3d 783, 789 (5th Cir. 2006) (internal quotation marks and citation omitted) (applying this standard to Title VII claims); *Dao*, 96 F.3d at 789 ("[T]he ADA incorporates by reference the procedures applicable to actions under Title VII . . . .").

[146] *Dao*, 96 F.3d at 789.  Although exhaustion of ADA claims is a prerequisite to suit, it does not appear to be a *jurisdictional* one, contrary to Defendants' argument.  *Cf. Arbaugh v. Y & H Corp.*, 546 U.S. 500, 516 (2006) ("[W]hen Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character."); *Pacheco*, 448 F.3d at 788 n.7 (citations and emphasis omitted) (collecting cases and observing that "[n]either the Supreme Court nor [the Fifth Circuit] sitting *en banc* has ruled that the exhaustion requirement [of Title VII] is subject to waiver or estoppel [unlike jurisdictional defects], and [the Fifth Circuit's] panels are in disagreement over that question").

[147] Defs.' Mot., Ex. C, "Robles' EEOC Charge of Discrimination," at 1, ECF No. 48-6.

alleging discrimination in violation of the ADA and ADA Amendments Act, "sufficiently encapsulates the failure to accommodate by Defendants [as] such a violation is defined as discrimination under the [two statutes]."[148]  Plaintiff's argument is contrary to the Fifth Circuit's decision in *Hamar v. Ashland, Inc.*[149]

In *Hamar*, the plaintiff filed a complaint with the EEOC alleging he was discharged, and furthermore, the plaintiff believed there had been discrimination "in that [he was] perceived as having a disability in violation of the [ADA]."[150]  The Fifth Circuit held the scope of the plaintiff's administrative complaint was "too narrow to have exhausted a claim for failure to accommodate."[151]  As claims for failure to accommodate and disparate treatment "represent distinct categories of disability discrimination under the ADA,"[152] the *Hamar* court held the EEOC "could not reasonably have been expected, when presented with a claim alleging disparate treatment . . . , to investigate the entirely distinct failure-to-accommodate claim arising from [earlier events]."[153]

In light of *Hamar*, Plaintiff's EEOC Complaint does not state a failure-to-accommodate claim. Even when analysis is expanded to include Plaintiff's EEOC Intake Questionnaire ("EEOC Questionnaire"),[154] submitted on March 22, 2014, there is no indication the agency was put on notice of a failure-to-accommodate claim.  In response to a question about what acts he believed were discriminatory,

---

[148] Pl.'s Resp. 7.

[149] 211 F. App'x 309 (5th Cir. 2006) (per curiam) (unpublished).

[150] *Id.* at 310.  The *Hamar* plaintiff's administrative complaint also stated his employer did not provide a reason for the discharge.  *Id.*

[151] *Id.*

[152] *Id.* (citing 42 U.S.C. § 12112(a), (b)(5)(A)).

[153] *Id.*  The *Hamar* court also observed that "the three [other] circuits that have considered this very same question [prior to *Hamar*] agree."  *Id.* (citing *MacKenzie v. Denver*, 414 F.3d 1266, 1274 n.13 (10th Cir. 2005); *Jones v. Sumser Ret. Vill.*, 209 F.3d 851, 854 (6th Cir. 2000); *Green v. Nat'l Steel Corp.*, 197 F.3d 894, 897–98 (7th Cir. 1999)).

[154] *See* Defs.' Mot., Ex. D, "Robles' EEOC Intake Questionnaire," ECF No. 48-7, at 4.

Plaintiff twice lists his termination (with Gacharna listed as the person responsible), asserts his HIV-positive status as his believed reason for the termination,[155] and lists being "rude to [a patient] and ha[ving] mood swings" as the reason his employer gave him.[156]  More importantly, in response to a question inquiring whether he "ask[ed his] employer for any changes or assistance to do [his] job because of [his] disability," Plaintiff marked the box for "No" and did not elaborate on his answer.[157]

Plaintiff's final argument is that even if the EEOC Complaint does not expressly advance a failure-to-accommodate claim, it "speaks to the exact factual circumstances surrounding what led to him requesting an accommodation."[158]  Plaintiff's argument is not persuasive for two reasons.

First, even if the facts in the EEOC Complaint are consistent with a failure-to-accommodate claim, this was not sufficient to exhaust administrative remedies.  Rather, the EEOC Complaint only exhausted claims within the scope of the EEOC investigation that could reasonably be expected to grow out of Plaintiff's administrative filings.[159]  If Plaintiff's argument was correct, then parties could exhaust failure-to-accommodate claims with the EEOC merely by avoiding contradictory allegations.[160]  As *Hamar* demonstrates, however, factual consistency is not sufficient to satisfy exhaustion requirements.

Second, Plaintiff's EEOC Complaint does not indicate Defendants could have been aware of issues requiring an ADA accommodation.[161]  While the EEOC Complaint alleges Defendants were aware

---

[155] On the EEOC Questionnaire, the word "fired" was twice misspelled as "fried."  EEOC Questionnaire 2.

[156] The court assumes the notation "pt" on the EEOC Questionnaire is shorthand for "a patient."  *Id.*

[157] *Id.* at 3.

[158] Pl.'s Resp. 18.

[159] *Pacheco*, 448 F.3d at 789 (internal quotation marks and citation omitted); *see also Dao*, 96 F.3d at 789.

[160] Plaintiff's argument also fails to account for the potential contradiction in his EEOC Questionnaire, in that he denied ever asking the center for either changes to his job or assistance.  EEOC Questionnaire 3.

[161] Regardless of whether Defendants could have known accommodations were needed, the issue is what the EEOC could have inferred from Plaintiff's administrative filings.

of Plaintiff's medical condition since June 1996 (approximately when he started his employment), it does not link it to any work issues until "three or so months" before his termination.[162]  The EEOC Complaint attributes these to side effects from Plaintiff's medication.[163]  However, it does not indicate whether Defendants could have attributed the issues to either Plaintiff's medication or his disability.  As the EEOC Complaint does not assert Plaintiff ever requested a reasonable accommodation, its lack of information suggesting Defendants were aware an accommodation was needed is a critical flaw in Plaintiff's argument.[164]

There was no information in the EEOC Complaint indicating Plaintiff was asserting a failure-to-accommodate claim.  As Plaintiff's EEOC Questionnaire responses similarly do not implicate such a claim, the claim has not been exhausted.  As the expiration of the statutory exhaustion deadline means he can no longer timely exhaust the claim,[165] Plaintiff's failure-to-accommodate claim pursuant to the ADA will be dismissed with prejudice for failure to comply with the ADA's exhaustion requirement.

B.      Rehabilitation Act Claims

Plaintiff has brought the same claims against Defendants under section 504 of the Rehabilitation Act as he has advanced pursuant to the ADA.  As previously discussed, the failure of Plaintiff's ADA claims' necessarily means Plaintiff cannot succeed on any of his Rehabilitation Act claims.  Therefore,

---

[162] EEOC Compl. 1.  The EEOC Complaint's express terms refer to "three or so months" before the administrative filing, rather than Plaintiff's last months of employment.  However, as Plaintiff was terminated approximately six months before the EEOC Complaint was filed, the "three or so months" phrase clearly refers to months before termination, rather than months before the administrative filing.

[163] *Id.*

[164] *Cf. Taylor v. The Principal Fin. Grp., Inc.*, 93 F.3d 155, 165 (5th Cir. 1996) ("Where the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent to the employer . . . , the initial burden rests primarily upon the employee . . . to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations.").

[165] As Plaintiff was terminated on September 24, 2013, he had until no later than July 21, 2014 (300 days after his termination) to present this claim to the EEOC.  *See Ramirez v. City of San Antonio*, 312 F.3d 178, 181 (5th Cir. 2002) (citing 42 U.S.C. §§ 2000e-5(e), 12117) ("Under the ADA, a plaintiff must file a charge of discrimination within 300 days of the alleged discriminatory act.").

Plaintiff's Rehabilitation Act claims will be dismissed with prejudice.

**V.**   **CONCLUSION**

"Defendants' Motion for Summary Judgment" [ECF No. 48] is **GRANTED**.  Accordingly, all of Plaintiff Carlos D. Robles's claims against Defendants Texas Tech University Health Sciences Center a/k/a Texas Tech University Health Sciences Center at El Paso; Bradley P. Fuhrman, M.D., in his official capacity; and Richard Lange, M.D., in his official capacity are **DISMISSED WITH PREJUDICE**.

**SO ORDERED.**

**SIGNED** this **18th** day of **September, 2015**.

**FRANK MONTALVO**
**UNITED STATES DISTRICT JUDGE**